UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THOMAS LEROY FULLER (#237590),

        Plaintiff,

                      CASE NO. 2:13-CV-13171
                      JUDGE MATTHEW F. LEITMAN
                      MAGISTRATE JUDGE ANTHONY P. PATTI

    v.

DAVID KERR,
GARY DAVIS,
JANET COCHRAN and
JOHN HAWLEY,

        Defendants.

_____/

## REPORT AND RECOMMENDATION REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DE 48)

**I.    RECOMMENDATION**:   The Court should grant in part and deny in part Defendants' December 31, 2014 motion to dismiss and for summary judgment (DE 48).

**II.    REPORT:**

### A.    Background

Thomas Leroy Fuller (#237590) is currently incarcerated at the MDOC's Marquette Branch Prison (MBP).   Fuller initiated this lawsuit on July 23, 2013 while incarcerated at the Carson City Correctional Facility (DRF).   DE 1.   He is proceeding *in forma pauperis*.   *See* DE 2, DE 4.

The Court granted Plaintiff leave to file a first amended complaint (DE 7), which he did on October 21, 2013 (DE 6).   Plaintiff was also given leave to file a second amended complaint.   *See* DE 17, DE 19.   The second amended complaint was filed on September 23, 2014 and names as defendants Kerr, Davis, Cochran and Hawley.   DE 26; *see also* DE 25.   The facts underlying Plaintiff's complaint span the one-month period from July 3, 2011 through Plaintiff's August 1, 2011 discharge from the program.   *See* DE 26 ¶¶ 10-34.[1]

## B.   Instant Matter

On December 31, 2014, Defendants Kerr, Davis, Cochran and Hawley filed a motion to dismiss and for summary judgment (DE 48), which sets forth four (4) arguments:

I.    The absence of a constitutional violation forecloses Plaintiff's claims under 42 U.S.C. § 1983.

II.   Plaintiff's claims of civil conspiracy fail as [a] matter of law because there is no record evidence of same.

III.  Plaintiff's claims of failure to administer an adequate medical remedy fail as a matter of law because there is no evidence that Plaintiff required or sought same.

---

[1] This case was originally assigned to Judge Ludington and Magistrate Judge Komives.   DE 1.   However, on May 20, 2014, the case was reassigned from Judge Ludington to Judge Leitman.   DE 8.   On July 22, 2014, Judge Leitman referred this case to Magistrate Judge Komives for pretrial matters.   DE 16.   Then, on January 13, 2015, this case was reassigned from Magistrate Komives to me.

IV.    Plaintiff's claims for assault and battery fail as a matter of law.

DE 48 at 6, 9, 20-26.

Plaintiff filed a response on March 20, 2015 (DE 55), Defendants filed a reply on March 27, 2015 (DE 57), Plaintiff filed an amended response on June 11, 2015 (DE 66),[2] and Defendants filed another reply on June 15, 2015 (DE 67).[3]

## C.    Standard[4]

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.    Fed. R. Civ. P. 56(a).    A fact is material if it might affect the outcome of the case under governing law.    *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).    The Court "views the evidence, all facts, and any inferences that may be drawn from

---

[2] Plaintiff's June 11, 2015 filing is labeled an "amended brief."    Therefore, the Court will refer to it, rather than to Plaintiff's March 20, 2015 brief in support. *Compare*, DE 55 at 8-22 & Exhibits A-L, DE 66 at 4-21 & Exhibits A-N.

[3] Also pending before the Court is Plaintiff's June 19, 2015 motion for appointment of counsel (DE 68).    By way of background, on March 31, 2015, the Court entered an order denying without prejudice Plaintiff's *ex parte* motion for the appointment of counsel.    DEs 49, 58.    The Court's resolution of Plaintiff's renewed motion for appointment of counsel will be addressed under separate cover.

[4] Defendants' December 31, 2014 dispositive motion is labeled a "motion to dismiss and for summary judgment."    DE 48 at 1; *see also* DE 1 at 8, 10. However, because this report analyzes Plaintiff's claims under the standard of Fed. R. Civ. P. 56, this report does not include standard Fed. R. Civ. P. 12(b)(6) language.

the facts in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004) (internal citations omitted).

"The moving party has the initial burden of proving that no genuine issue of material fact exists . . . ." *Stansberry v. Air Wis. Airlines Corp.*, 651 F.3d 482, 486 (6th Cir. 2011) (internal quotations omitted); cf. Fed. R. Civ. P. 56 (e)(2) (providing that if a party "fails to properly address another party's assertion of fact," then the court may "consider the fact undisputed for the purposes of the motion.").   "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'" *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).   The nonmoving party must "make an affirmative showing with proper evidence in order to defeat the motion." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009); *see also Metro. Gov't of Nashville & Davidson Cnty.*, 432 F. App'x 435, 441 (6th Cir. 2011) ("The nonmovant must, however, do more than simply show that there is some metaphysical doubt as to the material facts . . . .   [T]here must be evidence upon which a reasonable jury could return a verdict in favor of the non-moving party to create a genuine dispute.") (internal quotation marks and

4

citations omitted).   Summary judgment is appropriate when "a motion for summary judgment is properly made and supported and the nonmoving party fails to respond with a showing sufficient to establish an essential element of its case. . . ."   *Stansberry*, 651 F.3d at 486 (citing *Celotex Corp. v. Catrett*, 477 U.S. 371, 322-23 (1986)).

### D.   Discussion

#### 1.   Background Facts

##### a.   Medications

On April 22, 2011, while incarcerated at the Cooper Street Correctional Facility (JCS), Plaintiff's medications included Aspirin Buffered, Claritin, Coreg, Levoxyl, Norvasc, Plavix, Tylenol, Zetia and Zocor.   DE 66-1 at 20.   These medications appear to have been provided in conjunction with Plaintiff's release on parole.   DE 26 at 5 ¶ 25.

Nearly two months later, on June 21, 2011, Plaintiff's parole office referred him for residential treatment.   The referral form indicates that Plaintiff was ordered to complete Healthy Living at SHAR but is ineligible for SHAR due to his nitroglycerin prescription.   DE 48-3, DE 66-2 at 7.[5]

##### b.   Admission and Discipline Issues at TRI-CAP Facility

---

[5] The Court assumes SHAR refers to Self Help Addiction Rehabilitation.   *See* www.sharinc.org.

5

It appears that Plaintiff was admitted to the TRI-CAP Facility[6] on June 27, 2011, at which time he signed the following forms, policies, acknowledgments and authorizations:   "Orientation of TRI-CAP Facility," "Personal Hygiene Kit," "Possession/Use of Narcotic Medication or Tobacco Acknowledgement Form," "Resident Policy and Procedures Acknowledgement Healthy Living Program I and II," "Confiscation List," "Health Screening Form," "Medical Coverage and Resident Participation in Research," and a "Client Information Release Authorization."   DEs 48-4, 48-5, 48-6, 48-7, 48-9, 48-15 at 8, 48-16 and DE 66-1 at 40.

Seemingly at the time of his admission to TRI-CAP, Plaintiff received a de-licer application, also known as a Quell Shower.   DE 48-10.   He testified that it did not cause him any sort of injury or pain.   DE 48-8 at 3 (Pl.'s Dep. p. 44). He also requested medical attention for "extreme back pain."   DE 48-13.   On or about June 28, 2011, by a facsimile request to Upper Michigan Cardiovascular Associates, P.C., TRI-CAP Case Manager Carrie Blohm sought Plaintiff's medical information, noting, "I need to know how to get refills on his meds as well as the current meds he is taking."   DE 66-1 at 39.   Ms. Blohm received records on or

---

[6] TRI-CAP is a Community Corrections Program located in Saginaw, Michigan. *See* www.tricap.net.

6

about July 1, 2011.   DE 66-1 at 38.[7]   On July 7, 2011, Plaintiff received

prescriptions for Bactrim DS/Septra DS and Ultram (Tramadol) from Greenhouse

Center of Hope in Saginaw, Michigan, an apparent affiliate of St. Mary's of

Michigan.   DE 66-1 at 20.[8]

     Plaintiff received several rule violations while at TRI-CAP, including two

violations for smoking, three for creating a disturbance, and one for unauthorized

inside the building (UAIB), i.e., being in the bathroom with more than one other

resident without permission, all in July 2011.[9]   Among these were a July 3, 2011

rule violation for smoking issued by Resident Advisor (RA) David Kerr, for which

Plaintiff was assessed fifteen (15) days loss of privileges (LOP), and a July 8, 2011

rule violation for smoking apparently submitted by Vicki Ervin, which resulted in

termination.   DE 48-17 at 1-2, DE 66-1 at 29, DE 48-18 at 1-2.   The

accompanying Discipline Incident Report indicates, among other things:   "RA

Kerr had all three residents [Moll, Holt & Fuller] go into the staff bathroom, where

strip searches were done.   No contraband was found."   DE 48-17 at 2.

---

[7] These records are from 2009.   *See* DE 66-1 at 41-50, DE 66-2 at 1-6.

[8] On July 20, 2011, Plaintiff filled out a "Resident Complaint Form" regarding billing for an apparent July 5, 2011 visit to St. Mary's, when he requested to go to Jones Street Clinic.   DE 48-14.

[9] *See* DEs 48-17, 48-18, 48-19, 48-20, 48-21and 48-22.

Plaintiff's and Kerr's versions of the ensuing      Quell Shower / De-Licer Application differ and will be discussed, as necessary, below.   *Compare* DE 26 (Verified Compl.), DE 48-12 (Kerr's Affid.), DE 66-1 at 1-3 (Pl.'s Affid.).

On August 1, 2011, Plaintiff was terminated for an "unwillingness to participate in programming."   DE 48-23 at 2.   The Discharge Committee – comprised of Program Manager Gary Davis, Case Manager Janet Cochran and Executive Director John W. Hawley – issued a report which mentioned Plaintiff's July 8, 2011 rule violation and stated:   "Several other rule infractions, combined with his argumentative behavior and refusal to follow program rules, has led to his discharge from the facility.   He is being terminated."   DE 48-23 at 1.[10]   On the termination date, Plaintiff picked up the items which had been confiscated at the time of his admission – 2 packages of cigarettes, 1 cell phone charger and 1 lighter. DE 48-9.   Plaintiff alleges that his August 1, 2011 termination from TRI-CAP directly resulted in the revocation of Plaintiff's parole and his return to prison "for allegedly [having] failed to successfully complete the TRI-CAP Program."   DE 26 ¶ 24.

### c.   Strip Search and De-Lousing

---

[10] Plaintiff alleges that he "was not in any condition to smoke, his lungs were still recovering from the damage done to them by the insect spray he inhaled."   Plaintiff claims to have sought review of the video, but "Defendant Kerr told him that the video had been recorded over, and wasn't that a shame."   DE 26 ¶ 23.

Plaintiff's verified complaint and his affidavit describe his version of the circumstances leading up to a July 3, 2011 strip search, which involved an exchange of words.    DE 26 ¶¶ 10-12, DE 66-1 at 2 ¶¶ 3-5.    Thereafter, Plaintiff contends, "without warning, Kerr blasted Plaintiff in the face with the insect spray."    DE 26 at 3 ¶ 12; *see also*, DE 66-1 at 2 ¶ 5.    Plaintiff attests that, prior to this, he had "complied with all given orders."    DE 66-1 at 2 ¶ 5.    According to Plaintiff:

> As soon as the insect spray hit Plaintiff in the face and eyes, his face and eyes felt like they were on fire and his breathing was immediately constricted.    Defendant Kerr proceeded to spray the insect spray completely over Plaintiff's nude body, as Plaintiff violently cough[ed] and choked in an attempt to breathe.
>
> Plaintiff told Defendant Kerr that his face, eyes and chest were on fire and that he could barely breathe.    Defendant Kerr stopped spraying Plaintiff with the insect spray, laughed at Plaintiff suffering, and walked out of the room.    Plaintiff heard Kerr state in a mocking tone, "So, [I] am crazy!"    Plaintiff was not offered any medical assistance by TRI-CAP staff after being sprayed with the insect spray, although he repeatedly requested medical assistance.

DE 26 ¶¶ 13-14; *see also* DE 66-1 at 2 ¶¶ 6-7.

At the outset, it appears the parties are in agreement that the spray used on July 3, 2011 was SafeCleaners De-Licer.    *See* DE 48-11, DE 66-1 at 15-19, DE 67-3 at 4-5.    Although some of the product photographs supplied by the parties are difficult to read, it can be seen that the label of SafeCleaners De-Licer states,

among other things, "contains no pesticides" and "[a]void contact with eyes . . . ."
DE 48-11 at 1, DE 66-1 at 15-16.[11]

### 2.    COUNT I:   Excessive Force Resulting in Bodily Injury by Defendant Kerr

The basis for Plaintiff's *excessive force* claim – the Fourth Amendment's prohibition against *unreasonable* searches and seizures, the Eighth Amendment's prohibition against the infliction of *cruel and unusual* punishments, or the Fourteenth Amendment's prohibition against the deprivation of life, liberty, or property, *without due process* of law - is unclear.   *See, i.e., Valencia v. Wiggins*, 981 F.3d 1440 (5th Cir. 1993); *see also Leary v. Livingston County*, 528 F.3d 438, 450 (6th Cir. 2008) (discussion of "Source of Plaintiff's Constitutional Right to Be Free from Excessive Force") (Clay, J., dissenting).   For example:   Count I of

---

[11]   SafeCleaners' website describes its De-Licer as "the non-toxic and pesticide free head lice shampoo of choice."   *See* http://www.safe-cleaners.com/DL_Home.htm (last visited Aug. 11, 2015).   Also, the Material Safety Data Sheet (MSDS) for this product states, among other things, that no respiratory protection is required; the product should be kept out of the eyes; and the First Aid for entry into the eyes is to "[f]lush with a large amount of water for 15 minutes holding eyelids open[.]"   *See* http://www.safe-cleaners.com/_msds/DL_MSDS.pdf (last visited Aug. 11, 2015). The Court will take judicial notice of this information under Fed. R. Evid. 201.   *See City of Monroe Emps. Ret. Sys. V. Bridgestone Corp.*, 399 F.3d 651, 655 n.1 (6th Cir. 2005) (in the context of a motion to dismiss, taking judicial notice of the National Association of Securities Dealers' website as a public record); *Shalaby v. Bernzomatic*, 281 F.R.D. 565, 570 (S.D. Cal. 2012) *aff'd,* 584 F. App'x 419 (9th Cir. 2014) (taking judicial notice of a Material Safety Data Sheet).

Plaintiff's complaint cites the Eighth Amendment (DE 26 at 7 ¶ 36); Defendants analyze Plaintiff's excessive force claim under the Fourth Amendment (DE 48 at 20); and, Plaintiff's amended response brief again cites the Eighth Amendment, but also cites a case applying the Fourth Amendment, as well as another case which discusses the Fourth, Eighth and Fourteenth Amendments (DE 66 at 8-9).[12]

Nonetheless, whether this claim is analyzed under the Fourth Amendment's reasonableness standard,[13] the Eighth Amendment's prohibition of cruel and unusual punishment standard,[14] or under a Fourteenth Amendment "shocks the conscience" standard,[15] it remains that *there is a genuine issue of material fact as*

---

[12] Specifically, *Glenn v. City of Tyler*, 242 F.3d 307 (5th Cir. 2001); *Valencia v. Wiggins*, 981 F.3d 1440 (5th Cir. 1993).

[13] "[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Graham v. Connor*, 490 U.S. 386, 395 (1989).

[14] "[T]he standard for analyzing excessive force claims under the Eighth Amendment [is] 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Combs v. Wilkinson*, 315 F.3d 548, 556 (6th Cir. 2002) (quoting *Hudson v. McMillian,* 503 U.S. 1, 7 (1992)).

[15] The Due Process Clause "protects a pretrial detainee from the use of excessive force that amounts to punishment." *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989). "The proper standard for reviewing a substantive due process claim for deprivation of liberty interest arising under the Fourteenth Amendment is to determine if there was conduct which shocks the conscience of the court." *Allen v. Louisville City Police Dept.*, No. 91-6277, 1992 WL 168097, 4 (6th Cir. July 17,

*to the reason and motivation for which Defendant Kerr administered the July 3, 2011 quell shower.*    In Count I, Plaintiff claims that Kerr deliberately sprayed Plaintiff in the face with a chemical agent/insect repellent without need or provocation, constituting excessive force.    Plaintiff claims Kerr did so with the malicious intent to cause harm in violation of Plaintiff's Eighth Amendment right to be free from cruel and unusual punishment.    Having inhaled the chemical, Plaintiff's claimed damages include damage to his lungs and lasting side effects from such damage.    *See* DE 26 ¶¶ 35-37.

In his December 11, 2014 affidavit, Defendant Kerr attested:

- That in the process of strip searching Plaintiff, THOMAS FULLER, I observed something on his back that resembled lice or another insect.

- That in accordance with Tri Cap procedures and the recommended application procedure from the quell spray manufacturer, I asked Plaintiff, THOMAS FULLER, and the other two individuals to cover their eyes, and proceeded to spray them from the neck down with quell spray, asked them to turn around and sprayed their backsides, asked them to hold out their hands, sprayed their hands, and asked them to run the quell spray through their hair. . . .

- That this quell spray is Safe Cleaners' brand De-Licer and the application of same was consistent with the printed guidelines on the bottle. . . .

- That this quell spray was not aerosol-based.

1992).

- That at no point during this procedure did Plaintiff, THOMAS FULLER, show any signs of injury or distress specifically to his lungs, eyes, or any other area on his person.

DE 48-12 ¶¶ 4-8, DE 67-3.   Thus, it is Defendants' position that "there is simply no evidence that Defendant Kerr applied the quell spray to Plaintiff for any reason other than the legitimate purpose of ensuring that Plaintiff did not have lice."   DE 48 at 21.

On the other hand, at his November 13, 2014 deposition, Plaintiff testified that there were no lice.   DE 48-8 at 9 (Pl.'s Dep. p. 70).   Moreover, although he also testified that Defendant Kerr told Plaintiff to put his hands up over his eyes first, which is consistent with the related portion of Defendant Kerr's December 11, 2014 affidavit, Plaintiff's March 16, 2015 affidavit states:

> During the strip search of all of us, Kerr did not locate any cigarettes or smoking paraphernalia.   He then stepped directly in front of me and said[,] "you are a smart ass!"   He then without warning sprayed me directly in the face with a chemical agent.   I had prior to complied with all given orders.

DE 48-8 at 9 (Pl.'s Dep. p. 70), DE 48-12 ¶ 5, DE 66-1 at 2 ¶ 5.

Additionally, Plaintiff has submitted the Michigan Department of State Police's January 12, 2012 Original Incident Report and February 7, 2012 Supplemental Incident Report, each completed by Detective Sergeant Gary L. Thomas.   These included interviews and statements of Drew Edward Moll and

13

David John Holt, former TRI-CAP residents, as well as Defendant Kerr.[16]   To be

sure, Moll and Holt's statements to Detective Thomas should not be considered

here by the Court, because the statements are inadmissible.   *See* Fed. R. Evid.

801(c)(1), *Miller v. Field*, 35 F.3d 1088, 1091-1092 (6th Cir. 1994) ("While a court

may presume that a *preparer of a report,* under a duty to relate information, will

perform the task required and formulate justified conclusions and reasonable

opinions based on evidence *actually observed by the preparer,* no such

presumption arises when the preparer relies on potentially untrustworthy hearsay

evidence from another individual under no duty to provide unbiased

information.").   However, the statements made to Detective Thomas by

Defendant Kerr are not hearsay, because such statements are an opposing party's

statement.   Fed. R. Evid. 801(d)(2)(A).   Specifically, on January 24, 2012,

Defendant Kerr was interviewed by Michigan Department of State Police

Detective Sergeant Thomas.   According to the Original Incident Report, "**KERR**

---

[16] On January 26, 2012, Detective Thomas met with Drew Moll who "informed Detective THOMAS that in retaliation, **KERR** sprayed all three of them with 'Quell' (Kwell)."   DE 66-2 at 12-13.   Moreover, "**MOLL** advised that these additional searches and sp[r]aying with Quell were a form of punishment used by the staff members."   DE 66-2 at 13.   Detective Thomas interviewed David Holt over the telephone on February 7, 2012.   DE 66-2 at 16.   According to the Supplemental Incident Report, Holt "stated that the staff uses the strip searches and spraying as a form of punishment and resident humiliation."   Presumably referring to Plaintiff Fuller, Holt stated, "He refused to follow the rules and was disruptive so the staff retaliated whenever they could."   DE 66-2 at 17.

14

denied spraying any of the three with anything, including bug spray."   DE 66-2 at
11-12.

   Thus, there are stark contradictions between:   Plaintiff's verified complaint
(DE 26); Defendant Kerr's affidavit admitting that he sprayed Plaintiff with a
de-lousing agent but claiming it was justified (DE 48-12);   Plaintiff's deposition
testimony (DE 48-8, DE 57-2, DE 67-2) and affidavit (DE 66-1 at 1-3);[17]   as well
as Detective Thomas's representation that, on January 24, 2012, Defendant Kerr
denied spraying Plaintiff Fuller with anything at all (DE 66-2 at 11-12).   In
addition, between Kerr's July 3, 2011 discipline entry in Plaintiff's Tri-CAP Daily
Log (DE 66-1 at 29) and Kerr's July 3, 2011 Discipline Incident Report (DE
48-17), the strip search is mentioned but not the de-licer application.   In the
motion papers, Plaintiff suggests this omission was intentional, while Defendants
explain this is, at worst, a clerical error.   DE 66 at 10, DE 57 at 3.   In addition, as
Plaintiff notes, Kerr's January 24, 2012 statement about not spraying (DE 66-2 at
11-12), changed after the July 23, 2013 filing of this case (DE 1), because Kerr's
December 11, 2014 affidavit admits otherwise (DE 48-12 ¶ 5).   *See* DE 66 at 10.
Defendants' contention strains credulity.   In order for the Court to find that

---

[17] Plaintiff's March 16, 2015 affidavit, although signed by Plaintiff, is not
notarized.   However, it provides that the statements are made "under the penalty of
perjury[.]"   *See* DE 66-1 at 1-3.   Thus, this report treats Plaintiff's statements as
"[u]nsworn declarations under penalty of perjury."   28 U.S.C. § 1746.

Defendant Kerr's version of these facts is undisputed, it would have to ignore the obvious inconsistencies between Defendant Kerr's own statements and completely disregard Plaintiff's consistent sworn renditions of what occurred.   Such fact-finding at the summary judgment phase, without the benefit of weighing the respective parties' credibility, is impermissible.

In other words, Plaintiff has shown a genuine issue of material fact regarding the impetus for Defendant Kerr's July 3, 2011 de-licer application.   *Cf. Davis v. Cannon*, 91 F.App'x 327, 329 (5th Cir. 2004) (In the context of an Eighth Amendment claim, "Davis has failed to show any genuine issue of material fact that Steele sprayed him with a chemical agent maliciously or sadistically to cause him harm rather than in a good faith effort to maintain or restore discipline . . . ."). This remains true, even if, as Defendants appear to maintain, Plaintiff was not physically injured by the quell treatment; however, that, too, is a fact which is clearly in dispute.   *See* DE 48 at 20-21; *see also*, DE 48-12 ¶ 8; DE 66 at 19, DE 66-1 at 2 ¶¶ 6-7.   Summary judgment should therefore be denied as to this claim.

### 3.      COUNT II:   Assault and Battery by Defendant Kerr

"An assault is defined as any intentional unlawful offer of corporal injury to another person by force, or force unlawfully directed toward the person of another, under circumstances which create a well-founded apprehension of imminent

contact, coupled with the apparent present ability to accomplish the contact."
*Espinoza v. Thomas*, 189 Mich. App. 110, 119, 472 N.W.2d 16, 21 (1991) (citing
*Tinkler v. Richter*, 295 Mich. 396, 401, 295 N.W. 201 (1940), Prosser & Keeton,
Torts (5th ed), § 9, p 39).   "A battery is the wilful and harmful or offensive
touching of another person which results from an act intended to cause such a
contact."   *Id*.

Plaintiff claims that Defendant Kerr unnecessarily sprayed Plaintiff in the
face "with a dangerous chemical agent, without need or provocation[,]"
constituting assault and battery under Michigan law.   Here, too, Plaintiff's sworn
complaint lists "lasting side effects from the damage to his lungs caused by the
insect repellant[,]" among his damages.   *See* DE 26 ¶¶ 38-40.

At his deposition, Plaintiff denied smoking in the parking lot on July 3, 2011
at the time of the incident in question.   DE 48-8 at 8 (Pl.'s Dep. 67).   However,
in his response, Plaintiff "does not dispute the smoking incident or the ensuing
misconduct."   DE 66 at 19.   Moreover, I take note of Plaintiff's agreement that if
an RA sees lice or evidence of lice, the RA should use the de-licer.   DE 57-2 at 3
(Pl.'s Dep. p. 70).   However, Plaintiff also testified that there *were no lice*. *Id*.
Thus, the question of fact exists as to whether Kerr made use of the de-licer
because he saw what he believed to be lice or another insect, as Defendant Kerr

17

attests (DE 48-12 ¶ 4), or because Kerr acted unnecessarily "without need or provocation," as Plaintiff alleges (DE 26 ¶ 39).   If the latter, the trier of fact could reasonably conclude that the "Quell shower" constituted "force unlawfully directed toward" and/or an "offensive touching" of Plaintiff.   The Court should accordingly deny Defendant Kerr's request for summary judgment as to this claim.

### 4.   COUNTS III & V:   Eighth Amendment Deliberate Indifference to a Serious Medical Need

It is clear that Plaintiff is attempting to allege one or more claims of deliberate indifference to a serious medical need as prohibited by the Eighth Amendment.   *See*, *i.e.*, DE 26 at ¶¶ 42, 49.   "The deliberate indifference to serious medical needs of prisoners—e.g., the failure to respond to medical needs, intentional denial or delay of medical care, or intentional interference with a prescribed treatment—constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment."   *Burgess v. Fischer*, 735 F.3d 462, 476 (6th Cir. 2013) (citing *Estelle v. Gamble,* 429 U.S. 97, 104–05 (1976)).

The Court applies a two-prong test with objective and subjective components to assess claims of deliberate indifference to serious medical needs of prisoners. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).   First, the plaintiff must show that the deprivation alleged is "objectively, 'sufficiently serious.'"   *Id.* (citing *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).   Second, the plaintiff must show that the prison

18

official committing the act did so with a "'sufficiently culpable state of mind.'"

*Id.* (citing *Wilson*, 501 U.S. at 302-03).   The United States Court of Appeals for the

Sixth Circuit applies the test as follows:

> First, we determine whether the plaintiff had a sufficiently serious medical need under the objective prong.   A medical need is sufficiently serious if it has been diagnosed by a physician that has mandated treatment or it is so obvious that even a lay person would easily recognize the need for medical treatment. Second, we determine whether the defendant had a sufficiently culpable state of mind in denying medical care under the subjective prong.

*Burgess*, 735 F. 3d at 476 (internal citations and quotations omitted).   To succeed

on the subjective prong, a plaintiff must show "more than mere negligence, but

something less than specific intent to harm or knowledge that harm will result. . . ."

*Id.* (citing *Farmer*, 511 U.S. at 835).   Specifically, the conduct must "demonstrate

deliberateness tantamount to an intent to punish."   *Molton v. City of Cleveland*, 839

F.2d 240, 243 (6th Cir. 1988).   However, "a prisoner is not required to show that he

[or she] was literally ignored by the staff to prove an Eighth Amendment violation,

only that his [or her] serious medical needs were consciously disregarded."

*Rouster v. Cnty. of* Saginaw, 749 F. 3d 437, 448 (6th Cir. 2014).   Put another way,

> [a] government doctor has a duty to do more than simply provide some treatment to a prisoner who has serious medical needs; instead, the doctor must provide medical treatment to the patient without consciously exposing the patient to an excessive risk of serious harm.

*LeMarbe v. Wisneski*, 266 F.3d 429, 439 (6th Cir. 2001).

19

### a.   COUNT III:   Failure to Administer Adequate Medical Care

In Count III, Plaintiff takes issue with the care he received in the wake of the July 3, 2011 de-licing spray.   Plaintiff brings this claim against all four (4) defendants.   DE 26 ¶ 42.   In his verified complaint, Plaintiff claims he "violently cough[ed] and choked in an attempt to breathe."   DE 26 ¶ 13.   According to Plaintiff, he "told Defendant Kerr that his face, eyes and chest were on fire and that he could barely breathe."   He further alleges that when Kerr stopped spraying, he laughed at Plaintiff's suffering, left the room and mocked him.   He contends that he "was not offered any medical assistance by TRI-CAP staff after being sprayed with the insect spray, although he repeatedly requested medical assistance."   DE 26 ¶ 14.   Shortly after being sprayed, Plaintiff "became violently ill.   His chest burned with each labored breath[] he took, his vision was blurred for hours and he felt nauseous."   DE 26 ¶ 15.   Plaintiff alleges his symptoms continued to worsen and his requests for medical attention "fell on deaf ears of the TRI-CAP staff, including Defendant Kerr."   DE 26 ¶ 16; *see also* DE 26 ¶ 22, DE 66-1 at 2 ¶ 8 (Pl.'s Affid.).   Plaintiff goes on to allege that his condition "deteriorated to the point where he started vomiting and discharging thick yellow muc[ou]s from his

nose."   DE 26 ¶ 17.   Then, Plaintiff describes his subsequent visit to St. Mary's

Hospital:

- On or about July 6, 2011 TRI-CAP staff finally took Plaintiff to the emergency room at St. Mary's Hospital because his breathing had become so severally labored, that Plaintiff was at the point of suffocating.

- An emergency room physician at St. Mary's Hospital examined Plaintiff and treated him for having suffered chem[ic]al agent burns to his lungs as a result of inhaling the insect spray.   The physician prescribed several medications for Plaintiff.

DE 26 ¶¶ 18-19; *see also* DE 66-1 at 2 ¶ 9 (Pl.'s Affid.).

In sum, Plaintiff claims that Defendants Kerr, Davis, Cochran and Hawley

were deliberately indifferent to Plaintiff's serious medical needs by failing to

provide adequate medical care after Plaintiff "was deliberately sprayed in the face

with a dangerous chemical agent by Defendant David Kerr . . . ."   Plaintiff claims

that he "suffered for days before he was eventually transported to the emergency

room at St. Mary's Hospital."   Among his damages, Plaintiff claims, are "lasting

side effects from the damage caused to his lungs from the insect repellant."   DE

26 ¶¶ 41-43.

Thus Plaintiff responds to this motion by asserting that there is a factual

dispute as to whether Plaintiff made a request for medical assistance, which

Defendants deny. DE 66 at 16.   He also claims that he took the opportunity at St.

Mary's to get treatment and got antibiotics for his lungs, and the July 7, 2011

prescriptions of record were for Bactrim DS/Septra DS and Ultram (Tramadol).

DE 66 at 9, DE 66-1 at 20.

Here, the Court should conclude that Defendants are entitled to summary

judgment as to Plaintiff's claims against them concerning the care Plaintiff

received in the wake of the July 3, 2011 de-licing spray.   To be sure, Plaintiff

alleges in his complaint that he told Kerr about his reaction and "repeatedly

requested medical assistance."   DE 26 at 3 ¶ 14; *see also* DE 66-1 at 2 ¶¶ 7-8, DE

66 at 15-16.   However, at Plaintiff's deposition, defense counsel inquired about

Plaintiff seeking medical attention regarding the spray.   Plaintiff stated:   "I

requested it by 'How do I get the stuff off my face?'   Because it was burning.   I

mean, have you ever had bug spray in your face?   I don't see it to be in the

procedure to spray bug spray in somebody's face."   DE 57-2 at 3 (Pl.'s Dep. pp.

71-72).   He further testified that he "had to go to the bathroom and take a shower

and get that stuff off my face[,]" and admitted that he was allowed to take a shower

afterward.   DE 67-2 at 22 (Pl.'s Affid. P. 84).   He was further asked, "Did you

ever fill out a medical request form like the one in Exhibit 15 [dated June 27, 2011

(DE 48-13)] regarding seeking treatment for having been sprayed with the

de-licer?"   Plaintiff responded, "Not that I'm aware."   DE 57-2 at 3 (Pl.'s Dep. p. 71).

Moreover, whatever Plaintiff states about the treatment he had at St. Mary's, it seems the visit was prompted by his Monday, June 27, 2011 Request for Medical Attention regarding "extreme back pain," the notes for which state: "you will be seeing the nurse on Wednesday[.]   [L]et her know what is happening and we will go from there[.]"   DE 48-13.   And, when asked, "have you been diagnosed with any sort of specific condition by any medical professional regarding your lungs or respiratory system as a result of the delousing incident?" Plaintiff responded, "No." DE 48-8 at 10 (Pl.'s Dep. p. 88).   In addition, Defendants claim that Plaintiff did not respond to their October 3, 2014 requests for admissions, among which were requests to admit that "none of the above named Defendants sprayed Plaintiff *in the face* with an aerosol-based insect spray on or about July 3, 2011[,]" and "Plaintiff never suffered chemical agent burns to his lungs as a result of inhaling insect spray."   DE 48 at 15, DE 48-15 at 1-6 (emphasis added).

Therefore, having considered Plaintiff's complaint (DE 26), his deposition testimony (DEs 48-8, 57-2, 67-2), his request for medical attention (DE 48-13) and his apparent failure to respond to the requests for admission (DE 48-15), the Court should conclude that there is no genuine issue of material fact as to the subjective

23

component of Plaintiff's failure to administer adequate medical care claim.    These documents do not support a conclusion that Defendants were deliberately indifferent.    Even assuming *arguendo* that Plaintiff had a serious medical need, it does not appear that defendants "consciously disregarded" it.    *Rouster*, 749 F. 3d at 448.    Plaintiff formally asked for medical attention for extreme back pain at his June 27, 2011 arrival.    DE 48-13.    As to the July 3, 2011 incident, Plaintiff testified that he asked Defendant Kerr how to get the spray off of his face, and Plaintiff was permitted to take a shower.    He did not recall filling out a request for medical attention regarding the de-licer incident, and he was not aware of a resulting respiratory diagnosis.    Accordingly, the Court should conclude there is no genuine issue of material fact regarding Plaintiff's claim that Defendants were deliberately indifferent to his serious medical need in the wake of the July 3, 2011 de-lousing incident.[18]

### b.    COUNT V: Violation of 42 U.S.C. § 1983 and the Eighth Amendment

In Count V, Plaintiff takes issue with Kerr, Davis and Cochran's actions as to Plaintiff's prescription medication refills.    By way of background, Plaintiff claims he was provided a 30-day supply of the following medications when he was

---

[18] Moreover, Plaintiff was taken to the hospital on July 6, 2011; whether the impetus for this visit was his extreme back pain or for post-delicer treatment, Plaintiff claims to have taken that opportunity to get treatment for his lungs.    DE 66 at 9.

released on parole:   Zocor (Simvastatin), Zetia (Ezetimibe), Plavix (Clopidogrel), Norvasc (Amlodipine), Levoxyl (Levothyroxine), Coreg (Carvedilol) and Aspirin. DE 26 at 5 ¶ 25; *see also* DE 66-1 at 3 ¶ 12 (Pl.'s Affid.).

According to Plaintiff, he depleted the MDOC provided medications during his confinement at TRI-CAP.   DE 26 at 5 ¶ 26, *see also* DE 66-1 at 3 ¶ 13 (Pl.'s Affid.).   Plaintiff's TRI-CAP Daily Log indicates that he received medication frequently throughout his June 27, 2011 through August 1, 2011 stay.   DE 66-1 at 21-31.   It appears that Plaintiff last took Zocor (Simvastatin), Plavix (Clopidogrel), Norvasc (Amlodipine), Coreg (Carvedilol) and Bactrim on August 1, 2011.   It also appears that Plaintiff last took Levoxyl (Levothyroxine) on July 31, 2011, Zetia (Ezetimibe) on July 24, 2011 and aspirin on July 21, 2011.   *See* DE 66-1 at 21, 23-24.[19]

Plaintiff attests that "named defendants refused to obtain refills for me while I was a resident at TRI-CAP facility causing me undue stress pain and injury[.]" DE 66-1 at 3 ¶ 14 (Pl.'s Affid.).   Plaintiff describes his discussions with Kerr, Davis and Cochran.   DE 26 ¶¶ 27, 28, 30, 32, 33.   Among other things, Plaintiff claims that he "continued to complain about not having his medications refilled.

---

[19] On July 17, 2011, Plaintiff requested that his son and friend be able to visit on July 23, 2011.   It appears that this request was approved by a TRI-CAP counselor on July 22, 2011.   Counselor Blohm noted, "visitors can drop off aspirin during visit[.]"   DE 48-15 at 7.

That he was feeling the effects of not taking his medications.    That some of his medications were for treating his high blood pressure and over acti[v]e Thyroid." DE 26 ¶ 33.

Specifically, Plaintiff claims that Kerr, Davis and Cochran refused to provide and/or assist Plaintiff "in obtaining refills of his prescribed medications for the treatment of his serious medical conditions, demonstrated deliberate indifference . . . ." and that Defendants "knew or should have known that they had an obligation and/or responsibility to provide Plaintiff with refills of his prescribed medications while he was a resident at the TRI-CAP program."    DE 26 ¶¶ 51, 50.[20]    Among other alleged damages, Plaintiff claims "he suffered for days being without his prescribed medications[,]" and "the damage caused by not being able to treat his over active Thyroid has not yet [been] fully determined . . . ."    *See* DE 26 ¶ 52.

However, the Court should conclude that Defendants are entitled to summary judgment on this claim. Plaintiff's response that TRI-CAP staff was aware of his medication needs at the time of his arrival and agreed to accept him, even though he was indigent and had serious medical needs (DE 66 at 14), does not translate into TRI-CAP staff accepting responsibility for such needs or

---

[20] He also claims to have sought the assistance of his Parole Agent, Kathy Eickhoff. DE 26 ¶¶ 29, 31, 34.

providing medical treatment, and there is evidence that Plaintiff knew as much at the time of his arrival.   For example, on November 13, 2014, Plaintiff testified that he never asked for a medical attention form to fill out regarding his prescriptions.   R at 48-8 at 6 (Dep. Trans. P. 60).   Also, at his deposition, Plaintiff acknowledged his signature on the "Medical Coverage and Resident Participation in Research" form, which provides, in part:

> Medical treatment for a resident is a decision between the resident
> and his/her personal physician.   Tri Cap staff shall not, at any time,
> prohibit a resident from seeking medical treatment nor will Tri Cap
> be held liable for any medical expenses or coverage that I may incur
> while a resident at the facility.

DE 48-16, DE 48-8 at 7 (Dep. Trans. P. 62).

Moreover, the record does not support a conclusion that Defendants were deliberately indifferent to Plaintiff's apparent need for refills of his medications. To be sure, I note that Plaintiff's TRI-CAP Daily Log contains the following June 29, 2011 progress note: "mention[ed] that he would be in need of meds and doesn't have any money.   I [Lupe Castillo] spoke to the [G]reenhouse at 907-8775[.] [Fuller] will need to b[r]ing in a list of meds and ID.   A letter from Tri Cap will also be needed.   Just ask Mr. Davis . . . ."   DE 66-1 at 30.   However, unless these notes continue on a different page and offer more detail, this entry does not

equate to Defendants' knowledge.    Tellingly, the following exchange between

defense counsel and Plaintiff took place at the deposition:

> Q:    Let me make this very clear.    At the time that you initially
> requested and claimed that you were denied refills by Tri-Cap
> you did not have a prescription for any refills, correct?
>
> A:    Prescription – no, I didn't have no prescription.
>
> Q:    Okay.    Does Tri-Cap employ a doctor that's on site?
>
> A:    No.
> Q:    So if you wanted to go see a doctor to seek medical treatment
> you would need to fill out one of the Request for Medical
> Treatment forms, correct?
>
> A:    Yes.    I guess so.

DE 48-8 at 10 (Dep. Trans. P. 86-87).    Here, too, Defendants contend that

Plaintiff did not respond to the October 3, 2014 requests for admissions, among

which is a request to admit that the Tri-Cap records attached to the discovery

requests were true and accurate.    DE 48 at 18, DE 48-15 at 4.[21]

### 5.    COUNT IV:    42 U.S.C. § 1983 Civil Conspiracy

As the Sixth Circuit has counseled, "[a] civil conspiracy is an agreement

between two or more persons to injure another by unlawful action[:]

---

[21] Plaintiff also testified about diagnoses following the delay in getting prescription refills.    DE 48-8 at 10 (Pl.'s Dep. pp. 88-89).    Among other things, as noted above, Plaintiff claims that the effect upon his Thyroid has yet to be determined.    DE 26 ¶ 52.    However, resolution of this question would go to damages.

> Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy. Each conspirator need not have known all of the details of the illegal plan or all of the participants involved. All that must be shown is that [1] there was a single plan, that [2] the alleged coconspirator shared in the general conspiratorial objective, and that [3] an overt act was committed in furtherance of the conspiracy that caused injury to the complainant.

*Hooks v. Hooks*, 771 F.2d 935, 943-944 (6th Cir. 1985).   The Sixth Circuit

has further explained, "because '[r]arely in a conspiracy case will there be

direct evidence of an express agreement among all the conspirators to

conspire, ... circumstantial evidence may provide adequate proof of

conspiracy.'"   *Spadafore v. Gardner*, 330 F.3d 849, 854 (6th Cir. 2003)

(citing *Weberg v. Franks* 229 F.3d 514, 528 (6th Cir.2000) (alteration in

original)).

In his second amended complaint, Plaintiff claims that when he

returned to TRI-CAP from the hospital, he informed Davis and Cochran

that he wanted Kerr's July 3, 2011 assault and battery reported to the

Michigan State Police (MSP), claiming that "Kerr's spraying [Plaintiff] in

the face with the dangerous chemical was an assault with intent to do great

bodily harm to him."   DE 26 ¶ 20.   According to Plaintiff, Davis and

Cochran both stated that if Plaintiff continued to push having Kerr reported

to the MSP, Plaintiff would not like the results of his persistence.   DE 26 ¶

29

21; *see also* DE 66-1 at 3 ¶ 10 (Pl.'s Affid.).   Plaintiff claims to have told Hawley about Kerr's actions and Plaintiff's need to be taken to the hospital, but Hawley "advised Plaintiff that no one was going to cont[]act any police and that Plaintiff better forget all about the incident and concentrate on completing the program."   DE 26 ¶ 22; *see also* DE 66-1 at 3 ¶ 11.

In addition, Plaintiff alleges that Kerr stated, "we can have you sent back to prison and you can get all the medications your heart desires."   DE 26 ¶ 30.   Plaintiff's March 16, 2014 affidavit attests that Defendants "terminated me from the program for my constant complaints about my lack of medication ultimately causing me to be sent back to prison."   DE 66-1 at 3 ¶ 15 (Pl.'s Affid.).   Moreover, Plaintiff alleges that he heard Kerr state to Cochran that "he was tired of Plaintiff's constant bitching about his medications, we need to get rid of his ass."   DE 26 ¶ 32.   Also, Plaintiff alleges that Kerr and Davis both "advised Plaintiff that if they heard one more complaint about him not having his medications, he would be terminated from the program and sent back to prison, and that was a guarantee."   DE 26 ¶ 33.

In sum, Plaintiff's civil conspiracy claim against Defendants Davis, Cochran and Hawley is based upon their alleged "fail[ure] to intervene and report the use of

30

excessive force and assault and battery by Defendant David Kerr against Plaintiff, to the appropriate law enforcement authorities," and "threat[s] [to] Plaintiff [that] if he did not keep qui[et] about the incident he would be terminated from TRI-CAP program and returned to prison . . . ."   *See* DE 26 ¶¶ 44-46.   Plaintiff alleges loss of liberty among his related damages.   DE 26 ¶ 46.

In his amended response, Plaintiff infers that, as with Kerr's omission of the Quell treatment from the log, Defendants intended to omit Plaintiff's numerous request for assistance and medical issues.   DE 66 at 12 ¶ 1.   Plaintiff further contends that he called 911 on July 3, 2011 at approximately 7:00 p.m. from a TRI-CAP pay phone seeking to report the assault and battery, but dispatch would not assist Plaintiff.   DE 66 at 12 ¶ 2.   Moreover, pointing to some instances where his TRI-CAP Daily Log notes his complaints (DE 55-1 at 22-32), Plaintiff claims it is difficult to believe that he "would get sprayed in the face with a chemical substance and not say anything or fail to inform any staff member."   DE 66 at 12 ¶ 3.   Also, Plaintiff contends that his August 1, 2011 termination from TRI-CAP, although done in part for the July 3, 2011 incident, supports Plaintiff's allegation that Defendants threatened him about filing a report against Kerr.   DE 66 at 13 ¶ 4.

31

The Court should conclude that Defendants Davis, Cochran and Hawley are entitled to summary judgment regarding Plaintiff's conspiracy claims against them. "[E]vidence . . . which requires conjecture and inference upon inference[] is insufficient to sustain a conviction for conspiracy." *United States v. Coppin*, 1 F.App'x 283, 289 (6th Cir. 2001); *see also Moore v. City of Paducah*, 890 F.2d 831, 834 (6th Cir. 1989) ("Although Moore presents some circumstantial evidence, review of the briefs and district court findings reveals that there is no evidence beyond mere conjecture and speculation that an agreement existed, thus, precluding a finding of a conspiracy.").

I recognize the delay between the July 3, 2011 de-lousing incident in question and the apparent January 12, 2012 initiation of the MSP's investigation. DE 66-2 at 8-15, 16-18.   Nonetheless, Plaintiff's above-described "reasonable inferences in support of conspiracy claim," DE 66 at 11-13 ¶¶ 1-4, amount to conjecture.

One final note.   Oddly, while the conspiracy paragraphs of Plaintiff's complaint seem mostly related to Davis, Cochran and Hawley's alleged obstruction of reporting Kerr's July 3, 2011 actions to law enforcement authorities (*see* DE 26 ¶¶ 44-46), the parties' briefing takes a bit of a different direction.   For example, Defendants' conspiracy argument concerns medical treatment.   DE 48 at 21-23.

Also, the conspiracy section of Plaintiff's response mentions his requests for

medical assistance following the July 3, 2011 de-lousing incident and the failure to

provide medications.   *See, i.e.*, DE 66 at 11, 14.   Moreover, Defendants' reply

cites, among other things, the following exchange at Plaintiff's deposition:

> Q:   …Did you ever see Mr. Kerr, Mr. Davis, Ms. Cochran, and
> Mr. Hawley, all right, or any combination of those individuals,
> talking or discussing amongst themselves or communicating
> amongst themselves regarding some method of denying you
> medical coverage?
>
> A:   No.
>
> Q:   Do you have any evidence of any sort of communication like
> that that went on between those individuals?
>
> A:   No.

DE 57-2 at 4 (Pl.'s Dep. p. 88).

Therefore, to the extent, if at all, Plaintiff's conspiracy claim is based upon

an allegation that Defendants Davis, Cochran and Hawley conspired to deprive

Plaintiff of medical treatment following the July 3, 2011 incident or to deprive

Plaintiff of prescription refills, it also appears to be conjecture.   Even if the

non-descript TRI-CAP staff was aware of Plaintiff's need for medications and

intended to address this issue, as Plaintiff alleges he was informed by his parole

agent (DE 26 ¶ 31), this statement does not prove that Defendants, themselves, were aware of his need for medications.[22]

### 6.    Conclusion

Accordingly, the Court should grant in part and deny in part Defendants' motion for summary judgment.   (DE 48.)   Specifically, the Court should deny Defendants' motion as to Count I (excessive force) and Count II (assault and battery), but should grant Defendants' motion as to Counts III and V (deliberate indifference) and Count IV (conspiracy).

## III.   PROCEDURE ON OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).   Failure to file specific objections constitutes a waiver of any further right of appeal.   *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1981).   Filing objections that raise some

---

[22] Plaintiff's complaint asserts that Defendants "have acted, and continue to act, under color of state law . . . ."   DE 26 ¶ 9.   Defendants' motion does not contest that Defendants were acting under color of state law, and Defendants' reply assumes that Defendants are acting under color of law.   *See* DE 48 at 20-21, DE 57 at 5-7.   Thus, this report assumes that the TRI-CAP defendants are acting under color of state law. More importantly, although qualified immunity is mentioned within Plaintiff's response (*see, i.e.*, DE 66 at 17), this report does not address Defendants' reply brief's qualified immunity argument (DE 57 at 5-7), as Defendants did not raise it in the December 31, 2014 dispositive motion (DE 48).

issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.   *Willis v. Sec'y of Health & Human Servs.*, 932 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1273 (6th Cir. 1987).   Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No. 2," *etc.*   Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.   Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.   Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d).   The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," *etc.*   If the Court determines that any objections are without merit, it may rule without awaiting the response.

Dated: August 14, 2015                    s/Anthony P. Patti_____
                                          Anthony P. Patti
                                          UNITED STATES MAGISTRATE JUDGE

I hereby certify that a copy of the foregoing document was sent to parties of record
On August 14, 2015, electronically and/or by U.S. Mail.


                                    s/Michael Williams
                                    Case Manager for the
                                    Honorable Anthony P. Patti